**DAYTON (City) v. BRENNAN, Defendant.**

Municipal Court (Criminal Division).

No. 97074. Decided August 13, 1952.

Cecil Edwards, Pros., Arthur T. Eaton, Dayton, for complaining witness.

Albert Scharrer, Paul Ziegler, Dayton, for defendant.

## OPINION

By McBRIDE, J:

This case originated with the filing of an affidavit by Charlotte Wilkinson charging that on or about the 20th day of April, 1952, Larry Brennan, while operating a motor vehicle on Main Street failed to obey a red signal traffic light at Apple Street in Dayton, Ohio, thereby colliding with an Oldsmobile coach driven by Robert C. Wilkinson which was travelling eastwardly on Apple Street with the green signal

traffic light, contrary to Section 302 of the ordinances of the City of Dayton, Ohio.

On Sunday afternoon, April 20th, 1952, the defendant, an elected and part-time police constable of VanBuren township, was driving to the hospital to visit his wife. The constable was using his private car, in civilian clothes and not on duty. Entering Germantown Street, he observed a Box 21 car on an emergency run. The driver signalled him to follow. Defendant did so and reached the Dayton Speedway in Jefferson Township, where a racing car had crashed into the stands, killing four, injuring many and covering "hundreds" with an aluminum paint from drums which had been standing beside the stands.

When the defendant arrived, a deputy sheriff asked him to help move the crowd from the death car. Two bodies were still there awaiting the arrival of the coroner. The defendant worked with the crowd for several minutes and then moved away and conversed with friends. During this time, the seriously injured had been or were being taken to hospitals in ambulances and private cars. Others with minor injuries, paint and shock were standing around and leaving, as they were able, for a hospital for treatment and removal of the paint from their bodies. After 10 or 15 minutes, the defendant was asked if he would take a group to the hospital. He returned to his car and found three adults and two children waiting. One child was crying and carried by a woman whom he took to be her mother. The child appeared to have a leg injury. All, except the child, were "walking" cases. The defendant then mounted a flashing red light, which he had in the trunk of his car, and proceeded on an emergency run to the Miami Valley Hospital. He reached the hospital without incident. On the way, he used his radio to inquire as to the identity of a special policeman who had been killed. While at the hospital, he visited the morgue in an attempt to identify the party.

By this time, about one hour had elapsed. While at Miami Valley Hospital, defendant met a man who had made three trips to hospitals. Since this party had no red light on his car he asked to follow the constable back to the Speedway. Another man asked for a ride to the Speedway where he had left his car. Checking his red light, the constable proceeded with his passenger east on Wyoming and north on Main Street toward Apple. Earlier, at 3:06 P. M., the Sheriff's office received word that additional ambulances were not needed.

The testimony of what happened at the intersection is long and includes occupants of two cars, one waiting north of the light and another waiting south of the light, both of which

the defendant has no recollection. All of these witnesses, together with the occupants of the vehicle proceeding eastwardly, testified that the light was red for the defendant when he entered or that the operational factors were such that the light would have continued red until the defendant entered. They also fix the defendant's speed at 35 miles per hour or more. The defendant testified his speed was somewhat less, and that the light changed a split second before he entered. He also testified that he used his horn continuously, saw the vehicle proceeding eastwardly, but accelerated his speed as he saw the light change.

The facts clearly indicate, and we find, that the defendant entered the intersection on the red light.

The defense claims that the constable was operating an emergency vehicle on an emergency run. We shall consider the nature of the vehicle first since those requirements are statutory. For this purpose, we have reviewed and include the sections of the motor vehicle act which refer to emergency vehicles. Secs. 6307-2 and 6307-44 GC were amended in 1951.

Sec. 6307-2 GC contains a definition of emergency vehicles.

"Fire department, police and state highway patrol vehicles, vehicles of salvage corporations, organized under §§9873 to 9879 GC, inclusive, and emergency vehicles of municipal or county departments or public utility corporations, when identified as such as required by law, the director, or local authorities, and motor vehicles when commandeered by a police officer, ambulances and motor vehicles when used by volunteer firemen responding to emergency calls in the fire department service when identified as shall be required by the director."

Sec. 6307-44 GC gives the requirements for emergency vehicles.

"Upon the approach of an emergency vehicle, equipped with at least one flashing red light visible under normal atmospheric conditions from a distance of 500 feet to the front of such vehicle and when the driver is giving audible signal by siren, exhaust whistle, or bell, the driver of every other vehicle shall yield the right-of-way and shall immediately drive to a position parallel to, and as close as possible to, the edge or curb of the highway clear of any intersection and shall stop and remain in such position until the emergency vehicle has passed, except when otherwise directed by a police officer.

"Upon the approach of an emergency vehicle, as above stated, the operator of every street car or trackless trolley shall immediately stop such car clear of any intersection and keep it in such position until the emergency vehicle

has passed, except when otherwise directed by a police officer.

"This section shall not operate to relieve the driver of an emergency vehicle from the duty to drive with due regard for the safety of all persons and property upon the highway."

**Sec. 6307-4 GC** permits emergency vehicles to proceed cautiously past red or stop signal.

"The driver of any emergency vehicle when responding to an emergency call upon approaching a red or stop signal or any stop sign shall slow down as necessary for safety to traffic but may proceed cautiously past such red or stop sign or signal with due regard for the safety of all persons using the street or highway."

**Sec. 6307-24 GC** excepts emergency vehicles from the speed laws.

"The prima facie speed limitations set forth in Section 21 (§6307-21 GC) shall not apply to emergency vehicles when responding to emergency calls and the drivers thereof sound audible signals by bell, siren, or exhaust whistle. This provision shall not relieve the driver of an emergency vehicle from the duty to drive with due regard for the safety of all persons using the street or highway."

From these sections, a portion of which are included in the municipal ordinances, it is clear that because of the absence of a siren, exhaust whistle or bell, the automobile operated by the defendant was not an emergency vehicle and therefore he was not entitled to the right-of-way granted by §6307-44 GC, nor was he entitled to proceed "cautiously past such red or stop sign" as provided in §6307-4 GC.

The existence of an emergency situation does not authorize an operator to disregard normal traffic regulations unless the vehicle he is operating is designated as an emergency vehicle. The statute indicates clearly in the foregoing sections when and how an emergency vehicle may make an emergency run.

Protection of the public requires that rules regulating emergency vehicles be enforced and relaxed only under the circumstances set forth in the statutes which warn others on the highway of the unusual danger.

The prosecution also contends that an emergency did not exist. The "disaster" to which the prosecution repeatedly referred is claimed to have terminated. This is a question of fact to be determined by the Court, since there was no jury in this case; however, in view of our finding that the car in question was not designated as an emergency vehicle, a decision on the question as to whether an emergency existed is immaterial. We may say however that the radio call not to send further ambulances did not end the emergency in the case of every individual driver. Operators of some emergency

vehicles too readily switch on a siren when neither life, limb nor property are known to be in jeopardy and thereby accept responsibility for additional harm.

The defense pleaded rather eloquently that an exception exists for an "errand of mercy." Such an argument is wholly fallacious and must be expressly repudiated not only because the statutes recognize no such exception but also because an "errand of mercy" may become an errand to death or destruction for additional innocent parties.

Whether an emergency exists is a matter of fact for the Court and jury to decide under all the circumstances of an individual case. Otherwise it would be possible for an officer to drive, or direct a subordinate, to make an emergency run to reach a meeting on time, or it would be equally possible for a volunteer to rush a victim to a hospital in reckless disregard of the law even though his vehicle was not properly identified so as to warn the general public. These examples indicate the two statutory requirements which such vehicles must meet. They must be identified and announced as required by the statute and an emergency must exist. There are additional requirements under the municipal ordinances of Dayton, however, the general statutes cited determine the law of this case.

It is argued that the defendant cannot be found guilty unless the prosecution establishes a criminal intent to enter on the red light. Negligence is the failure to exercise ordinary care or a failure to perform an act required by law. Under the motor vehicle act, the doing or refraining from doing any of the definite acts specified in the statute constitutes not only negligence, but also what has been described as criminal negligence. In other words, the statute imposes an absolute duty and violation thereof constitutes a crime. Intent is not an element in a criminal prosecution arising under the definite requirements of the motor vehicle act. **State of Ohio v. Saam (Saan), 36 O. O. 271** (CP Judge Lamneck), **50 Abs 5.** Also **12 O. Jur.** on the subject of intent.

This accident at Main and Apple Streets was a serious tragedy. It followed the Dayton Speedway disaster of April 20th, 1952, which started emergency vehicles screaming over the city streets for nearly an hour. The record discloses the tragic handicaps under which township and police constables operate.

In this case, a young, untrained and unexperienced constable went about his duties with enthusiasm but without a siren or exhaust whistle as required by law. He undertook the responsibilities of a police officer on January 1, 1952, using his private car, on which he was able to acquire only a

red signal light. He was otherwise employed to support his young and growing family. We do not know how he acquired the radio, but recognize that many constables expend personal funds to equip their cars.

While the Sheriff is the chief law enforcement officer in the county, constables have equal and concurrent authority not only in the township in which they are elected or appointed, but throughout the county. This court is particularly conscious of the situation in which such officers find themselves, because it was our decision in **Hoover v. Blackmore, 54 Abs 177,** 84 N. E. 447 (4-14-49), which resulted in the establishment of legal traffic signs and signals throughout this county, resulting in additional enforcement problems for the constables. One of the arguments, which delayed such action by the county, was the inexperience and lack of qualifications of the township police officers. As a result of the resolution legalizing the county traffic signs and signals, constables responded without serious complaints although not all possessed vehicles identified as otherwise required by law to authorize them to perform regular traffic patrol duties. **Sec. 12616-1 GC.** Constables, who for practical purposes, are volunteers in that they must otherwise work for a living as well as supply their own equipment, have improved their efficiency locally without legislation and without financial assistance. Township trustees are unable, for many reasons, to supply constables with essential equipment for motor vehicles. Much has been said but little has been done to improve the antiquated system under which township enforcement officers operate. This case discloses that it is morally wrong to entrust such duties to officers who are not provided with the equipment so necessary for the protection of the public. Others have pleaded for changes and improvements for so many years that we have no reason now to believe that anything further this Court might add would achieve any results.

The Court has considered this case more thoroughly than is usual for a traffic violation for which the penalty is not significant, however, the extent of the personal injuries and the other circumstances are such as to justify all the attention that has been given it by the Court and by the attorneys in their presentation and argument.

Verdict: GUILTY.